UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA          CASE NO. 18-cr-00091-01

VERSUS                            JUDGE DRELL

KENYATTA EDMOND (01)              MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Pending before the Court is the motion to suppress [Rec. Doc. 26], which was filed by the defendant Kenyatta Edmond (01). The motion is opposed. [Rec. Doc. 27]. The motion was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court.

An evidentiary hearing was held on July 30, 2018. Testifying for the Government was Lafayette Police Officer Cody Richard. Video footage from body cameras worn by three officers at the scene of the defendant's arrest was also admitted, without objection, for the Court's review outside of the hearing. No witnesses testified for the defendant. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motion be DENIED.

## **Factual Background**

On January 22, 2018, at approximately midnight, Lafayette Police Officer Cody Richard was dispatched to the intersection of Evangeline Thruway and Mudd Avenue, in Lafayette. The dispatcher relayed that an officer on the scene was requesting additional units, in response to a citizen's report of a man asleep in the driver's seat of a running motor vehicle, stopped at a traffic light, with a handgun in his lap. The vehicle, a black Ford Mustang, was obstructing traffic in the right lane of travel. Officer Richard testified that, when he arrived on scene, the other officers had their guns drawn and were waiting for him to approach the vehicle, which had now been stopped at the traffic light through multiple light-change cycles, during which time the Mustang continued to block road traffic.

Officer Richard approached the driver's side of the vehicle and personally observed the driver, later identified as the defendant, who appeared to be sleeping with a handgun in his lap and his hand positioned on the gun's grip. With his gun drawn in one hand, Officer Richard reached out and opened the driver's side door with the other hand while verbally commanding the defendant to show his hands. Officer Richard noted that, upon awakening, the defendant seemed disoriented and testified that the vehicle briefly moved forward. Officer Richard further confirmed that the defendant appeared to hit the vehicle's accelerator before abruptly stopping the vehicle and exiting, pursuant to the officers' commands.

Upon exiting the vehicle, the defendant was placed in handcuffs for safety purposes, according to Officer Richard's testimony, in light of the known presence of at least one firearm in the defendant's vehicle. The officers conducted a pat-down search and found no weapons on the defendant's person. At that time, Officer Richard advised the defendant of his *Miranda* rights, of which the defendant indicated his understanding. Meanwhile, other officers on the scene were conducting a protective sweep of the open, driver's side of the vehicle, during which time the officers located the firearm, previously observed in the defendant's lap, now on the driver's side floorboard. The defendant further alerted the officers to the presence of a second firearm inside the vehicle, which was then discovered to be a stolen firearm. The defendant was placed under arrest for, *inter alia*, possession of firearms by a convicted felon.

The body camera video footage submitted in conjunction with the evidentiary hearing includes three captures from cameras worn by three different officers on the scene. For purposes of this ruling, because the individual officers are not identified by name, the videos will be referred to as "Camera 1" (identified on disc as "AXON BODY 2 X81123859"), "Camera 2" (identified on disc as "AXON BODY 2 X81140794"), and "Camera 3" (identified on disc as "AXON BODY 2 X81141282," and believed to be Officer Richard's body camera).

Camera 1 depicts the black Mustang, stopped right at the intersection in the far right lane of travel. Camera 1's officer approaches the passenger side of the vehicle, with gun drawn, and appears to peer inside of the vehicle. The officer is then heard relaying unintelligible information to dispatch and reporting to another officer on scene: "He's passed out, man. But he's got a gun, sitting on his lap, and he's got his hand on it."[1] The officer indicates that he is waiting for backup before taking further action. Camera 1 then captures other officers on scene, some discussion of safety precautions regarding the officers' anticipated approach of the defendant's vehicle, and an officer warning that the vehicle "may be in drive."[2]

Camera 1 then continues to capture, from the rear of the vehicle, an officer's approach to the driver's side door, at which point the vehicle is shown accelerating forward, almost into the intersection, and then abruptly stopping.[3] Multiple officers are captured, with guns drawn, giving verbal commands to the defendant to "get out of the car," "show your hands," and "don't reach down."[4] The defendant ultimately exits the vehicle. An officer can be heard on Camera 1, advising the defendant that he was "passed out behind the wheel," and committed "a traffic violation, impeding the flow of traffic."[5] Camera 1's officer then approaches the driver's side door of the

---

[1] AXON BODY 2 X81123859, at 00:41-01:10 (dispatch noise) and 01:42-01:47 (reporting information to officer on scene).
[2] *Id.* at 02:58-03:04.
[3] *Id.* at 03:18-03:24.
[4] *Id.* at 03:24-03:53.
[5] *Id.* at 04:08-04:15.

vehicle, behind another officer, and observes in the vehicle "a scale… oh, [and] he's got some weed, he's got a gun and some weed."[6]

Camera 1 then depicts Officer Richard, who is in the process of advising the now-handcuffed defendant of his *Miranda* rights.[7] Camera 1's officer then explains to the defendant that the officers "got flagged down because [the defendant] was passed out at the wheel, with a gun in [his] lap[.]"[8] The officer goes on to explain that "marijuana and the gun is the charge," and that the defendant is under arrest.[9] The officer also inquires as to why the defendant had a gun in his lap; however, the defendant's response is unintelligible. Towards the end of Camera 1's capture, Officer Richard is heard asking the defendant "you say you had two guns in the car?"[10] Other officers are heard confirming that both guns were recovered.

Camera 2 shows the officer's approach to the driver's side door of the vehicle, at which point the defendant is awakened by the officer opening the vehicle's door.[11] The defendant appears notably startled, attempts to close the door and accelerates, before abruptly stopping the vehicle and exiting, pursuant to the officers' commands.[12] The defendant is placed in handcuffs and held some distance away

---

[6] *Id.* at 04:22-04:26.
[7] *Id.* at 04:49-05:02.
[8] *Id.* at 05:06-05:10.
[9] *Id.* at 05:14-05:23
[10] *Id.* at 06:11-06:18.
[11] AXON BODY 2 X81140794, at 00:57-01:05.
[12] *Id.* at 01:06-01:48.

from the vehicle.[13] Camera 2's officer then returns to the vehicle, retrieves a handgun from the driver's side floorboard of the vehicle, and reports to another officer that the vehicle contains "some weed . . . a scale and a gun."[14] Camera 2 then also captures Camera 1's officer engaged in the above-described inquiry as to why the defendant had a gun in his lap.[15] Camera 2's officer then returns to the vehicle and discovers the second gun, also near the driver's seat, described as a .410 gauge Taurus revolver.[16]

Camera 3, believed to be worn by Officer Richard, again shows the approach to the driver's side door, at which time the defendant clearly appears to be unconscious until the officer opens the door, startling and waking the defendant.[17] Camera 3 captures a similar angle to that of Camera 2, showing the vehicle accelerating forward and then abruptly stopping, just inside of the intersection.[18] In addition to the previously described commands, an officer can be heard advising the defendant to place the vehicle in park, at which point the officers retreat somewhat, while the defendant's hands are out of sight.[19] The defendant exits the vehicle and is handcuffed.[20]

---

[13] *Id*. at 01:48-01:56.
[14] *Id*. at 02:22-02:24 and 03:03-03:18.
[15] *Id*. at 03:18-03:37.
[16] *Id*. at 04:37-04:52.
[17] AXON BODY 2 X81141282, at 00:36-00:48.
[18] *Id*. at 00:48-00:53.
[19] *Id*. at 00:54-01:10.
[20] *Id*. at 01:16-01:36.

At this point, on Camera 3, the defendant is asked whether he has "any other weapons on *you*," to which he responds that there are "two guns in the car."[21] Officer Richard then advises the defendant of his *Miranda* rights, and the defendant explicitly indicates his understanding thereof.[22] About a minute later, Officer Richard is heard confirming with the defendant that there are two guns in the car.[23] Officer Richard is later heard calling in the serial numbers of each firearm, PY107361 (Beretta .40 caliber) and AY567924 (Taurus .410 gauge revolver), at which time he is advised that the latter (Taurus) has been reported stolen in connection with a residential burglary.[24] Officer Richard identifies the defendant, by name, over the radio.[25] Towards the end of Camera 3's capture, Officer Richard advises the defendant that he is being charged with the state crimes of "felon in possession of a firearm, possession of stolen firearm, and [] possession of marijuana."[26]

Ultimately, on April 11, 2018, the defendant was indicted by a federal grand jury on one count of possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[27] The instant motion was filed on July 5, 2018.

---

[21] *Id*. at 01:37-01:45.
[22] *Id*. at 02:15-02:28.
[23] *Id*. at 03:36-03:42.
[24] *Id*. at 11:55-14:47.
[25] *Id*. at 15:00-15:12.
[26] *Id*. at 20:05-20:25.
[27] Rec. Doc. 1.

## Contentions of the Parties

Edmond challenges the legality of the warrantless search of his vehicle and the officers' alleged failure to immediately advise Edmond of his *Miranda* warnings upon his seizure and detention. He therefore moves to suppress all evidence and pre-*Miranda* statements, *i.e.* the defendant's admission that there were two guns in the vehicle, as the fruit of an unconstitutional search and seizure. The Government contends that the officers' actions were justified at inception, based upon the citizen's complaint, later confirmed by the officers' own observations, that a man appeared to be asleep, behind the wheel of a running motor vehicle, with a gun in his lap. Based on the specific and articulable facts known to Officer Richard at the time he encountered the defendant, the Government argues that he had probable cause for the "stop" and subsequent search, given that the armed defendant posed a danger to himself and others, and was also obstructing traffic, in violation of Louisiana Revised Statute 14:97.[28]

## Applicable Law and Analysis

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures.[29] Under the Fourth Amendment, people are

---

[28] Louisiana Revised Statute 14:97 prohibits the simple obstruction of a highway of commerce, which is "the intentional or criminally negligent placing of anything or performance of any act on any . . . road, highway, [or] thoroughfare . . . which will render movement thereon more difficult."
[29] *United States v. Oliver*, 630 F.3d 397, 405 (5th Cir. 2011); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).

guaranteed the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and search warrants are to be issued only upon probable cause.[30] Because the Fourth Amendment itself contains no enforcement mechanism, the exclusionary rule developed as a judicially-created remedy to safeguard Fourth Amendment rights.[31] In general, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure and thereby deters police misconduct.[32] Under the fruit of the poisonous tree doctrine, all evidence derived from an illegal search or seizure must be suppressed unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.[33]

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights."[34] However, warrantless searches are presumptively unreasonable under the Fourth Amendment, and the Government

---

[30] *Club Retro, LLC v. Hilton*, 568 F.3d 181, 195 (5th Cir. 2009).

[31] *Davis v. United States,* 564 U.S. 229, 236 (2011).

[32] *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005); *see also Davis*, 564 U.S. at 236-37 ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.")

[33] *United States v. Jones*, 234 F.3d 234, 243–44 (5th Cir. 2000); *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

[34] *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001); *see also United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993); *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992).

bears the burden of establishing by a preponderance of the evidence that the search or seizure was constitutional.[35]

Traffic stops are considered seizures within the meaning of the Fourth Amendment.[36] Under *Terry*, a traffic stop is reasonable if: (1) the officer's action was justified at its inception, and (2) the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.[37] The Government bears the burden of establishing each of these elements by a preponderance of the evidence.[38] Here, the Government argues that, under *Terry*, the officer's actions were justified from inception, based on the citizen's complaint as well as the observations of the officers on the scene, that the defendant appeared to be unconscious, behind the wheel of a running motor vehicle, which was blocking traffic in violation of Louisiana Revised Statute 14:97, with a firearm visible on his lap.[39]

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion – before stopping the vehicle – that some sort of illegal activity, such as a traffic violation, has occurred or is about to occur.[40] In the

---

[35] *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999); *United States v. Berick*, 710 F.2d 1035, 1037 (5th Cir. 1983); *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).
[36] *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Jones*, 234 F.3d at 239.
[37] *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968); *Grant*, 349 F.3d at 196.
[38] *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010); *United States v. Martinez*, 486 F.3d 855, 859–60 (5th Cir. 2007).
[39] *Terry, supra; United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).
[40] *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

instant case, the defendant "does not contest his initial seizure by the Lafayette Police Officers."[41] Indeed, both Officer Richard's testimony and the officers' body camera footage from the scene clearly show that the officers had probable cause to believe that the defendant was, at the very least, in violation of Louisiana Revised Statute 14:97, in that his vehicle was obstructing the flow of traffic. Thus, *Terry*'s first prong is satisfied and not in dispute. Turning to the second prong, it is highly significant that the defendant was not only committing a traffic violation, but officers on scene were also subjectively aware that there was a weapon present and on the defendant's person.

"In *Terry*, the Supreme Court held that police officers may detain individuals briefly on the street, even though there is no probable cause to arrest them, as long as they have a reasonable suspicion that criminal activity is afoot."[42] "Reasonable suspicion under *Terry* must be based on 'specific and articulable facts,' and the facts must 'be judged against an objective standard.'"[43] "The Court in *Terry* also held that a police officer who reasonably believes that he is dealing with armed and dangerous individuals may conduct a limited protective search for weapons."[44] For purposes of justifying a *Terry* pat-down, "[t]he officer need not be absolutely certain that the

---

[41] Rec. Doc. 26-1, p. 4.
[42] *United States v. Baker*, 47 F.3d 691, 693 (5th Cir. 1995).
[43] *Id*. (quoting *Terry*, 392 U.S. at 21).
[44] *Id*. (citing *Terry*, 392 U.S. at 22-24).

individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[45] "Where an initial stop and pat-down of an occupant of a car are justified under *Terry*, a search of the car for weapons is also a valid '*Terry* pat-down' of the car."[46]

The Supreme Court confirmed in *Michigan v. Long* that *Terry* allowed officers to conduct a protective search of the passenger compartment of a vehicle to uncover weapons, as long as the officers possess an articulable and objectively reasonable belief that the suspect is potentially dangerous.[47] Pursuant thereto, the Fifth Circuit has upheld protective searches of automobiles under the Fourth Amendment "where the police officer had an objective reason to fear for his safety or the safety of others."[48] On the other hand, the Fifth Circuit has rejected protective searches where "the officers had almost nothing on which to base a concern for

---

[45] *Terry*, 392 U.S. at 27.

[46] *United States v. Brown*, 209 F. App'x 450, 452 (5th Cir. 2006) (citing *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004) (upholding protective sweep of car as *Terry* pat-down under the rationale set forth in *Michigan v. Long*, 463 U.S. 1032 (1983)).

[47] 463 U.S. at 1051.

[48] *Wallen*, 388 F.3d at 165 (citing *Baker*, *supra*, 47 F.3d at 694 (upholding protective automobile search based on existence of hunting knife, ammunition, and occupant's general statement that she "did not know" the location of a pistol); *United States v. Coleman*, 969 F.2d 126, 131 (5th Cir. 1992) (upholding protective automobile search after an individual stopped for traffic violation admitted to possessing gun in pouch where he kept license and registration); *United States v. Maestas*, 941 F.2d 273, 277 (5th Cir. 1991) (upholding search of a car based on accusatory and threatening conversations between two parties in car)).

safety; the police did not observe unusual weapons, nor did the individuals act in a particularly suspicious manner."[49]

In *Long*, the Supreme Court cited two other cases, in which it "applied *Terry* to specific factual situations [and] recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers."[50] The first case was *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), in which the Supreme Court "held that police may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous."[51] *Mimms* "rested in part on the 'inordinate risk confronting an officer as he approaches a person seated in an automobile.'"[52] The second case was *Adams v. Williams*, 407 U.S. 143 (1972), in which the Supreme Court "held that the police, acting on an informant's tip, may reach into the passenger compartment of an automobile to remove a gun from a driver's waistband even where the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip."[53] There, too, the "decision rested in

---

[49] *Id.* (citing, *e.g.*, *Estep v. Dallas County*, 310 F.3d 353, 358 (5th Cir. 2002) (holding that camouflage gear, National Rifle Association sticker, key-chain mace, and an unusual tone of voice on the part of the passenger did not justify protective automobile search); *United States v. Hunt*, 253 F.3d 227 (5th Cir. 2001) (holding that the mere fact that the driver met the officer outside his car with a license does not justify a protective search)).

[50] 463 U.S. at 1047.

[51] *Id.* at 1047-48 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)).

[52] *Id.* at 1048 (quoting *Mimms*, 434 U.S. at 110).

[53] *Id.* at 1048 (citing *Adams v. Williams*, 407 U.S. 143 (1972)).

part on [the Supreme Court's] view of the danger presented to police officers in 'traffic stop' and automobile situations."[54]

Here, the officers were confronted with an unconscious defendant, holding a gun and operating a motor vehicle in an objectively unsafe and illegal manner, at approximately midnight. Far from *Terry*'s minimal requirement that the officers hold a *reasonable belief* that the suspect *may* be armed and dangerous, these officers were absolutely certain that the defendant was armed and therefore dangerous to himself and/or others. The record clearly supports this finding.

Officer Richard was dispatched to the scene based on a report of an unconscious man, blocking traffic in the driver's seat of a running vehicle, with a gun on his lap. This fact is corroborated by the video footage of Camera 1, which clearly captures an officer approaching the vehicle and personally observing the gun, prior to Officer Richard's approach.[55] In addition to arriving with these facts in mind, Officer Richard testified that he, too, observed the gun in the defendant's lap prior to opening the vehicle's door. "When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine

---

[54] *Id.*

[55] *See* footnote 1, *supra* (Camera 1's officer states "He's passed out, man. But he's got a gun, sitting on his lap, and he's got his hand on it." AXON BODY 2 X81123859, at 01:42-01:47).

whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'"[56] The facts allow no room for doubt that the officers knew that a weapon was not only present but also physically in the hand of, and therefore readily accessible to, the defendant.

Nonetheless, the defendant argues that the Government has failed to rebut the presumption that the warrantless search of his vehicle was unreasonable, given that the video footage does not capture a weapon in either of the defendant's hands. The defendant points out that, as soon as he was awakened, the video shows him placing one hand on the door and the other on the steering wheel, both hands being "gun-free." This Court is unpersuaded.

Once the defendant exited his vehicle and was placed in handcuffs, the above-recited facts clearly allowed for a protective search of his person. Having observed a weapon on his person just minutes before, while the defendant was seated in the vehicle, the officers were authorized to conduct a protective search of the vehicle as well.[57] The Fifth Circuit has "recognized that suspects in handcuffs can remain a danger to the police, particularly when weapons are present."[58] Despite the defendant's argument to the contrary, the fact that his hands were "gun free" just

---

[56] *Long*, 463 U.S. at 1047 (quoting *Terry*, 392 U.S. at 24).
[57] *Long*, *supra,* 463 U.S. at 1051.
[58] *Wallen*, 388 F.3d at 166 (citing *United States v. Sanders*, 994 F.2d 200, 208-10 (5th Cir. 1993)); *see also United States v. Ibarra–Sanchez*, 199 F.3d 753, 760 n. 7 (5th Cir. 1999) (noting that a *Long* protective sweep of a van "might also be justified" in a case where the police had placed all the occupants in handcuffs and in the backseats of their patrol cars).

minutes after a gun was observed in his hand, sitting on his lap, does not undermine or diminish the officers' reasonable belief, based on at least three independent observations, that a weapon was present. Both Officer Richard's testimony, as well as the video footage, supports the likelihood that the defendant stopped the vehicle in such an abrupt manner that a gun sitting on his lap could have easily been thrown onto the driver's side floorboard, where a gun was ultimately found. Because the initial stop and pat-down of the defendant was justified under *Terry*, the search of the car for weapons was also a valid *Terry* pat-down of the car.[59]

The defendant further challenges his "pre-*Miranda* statements," arguing that, after handcuffing him, the officers immediately "began questioning [the defendant] about whether he had firearms in the vehicle without informing [the defendant] of his rights pursuant to *Miranda*."[60] However, the video footage contradicts the defendant's argument. As recited above, Officer Richard's body camera footage (Camera 3) captures the interaction between Officer Richard and the defendant, during which time the officer is conducting a protective pat-down of the defendant and asks whether he has "any other weapons on *you*," meaning on the defendant's person.[61] In response, the defendant admits that there are "two guns in the *car*."[62]

---

[59] *Brown*, 209 F. App'x 452; *Wallen*, 388 F.3d at 166; *Long*, 463 U.S. at 1051.
[60] Rec. Doc. 26-1, p. 2.
[61] *Id*. at 01:37-01:45.
[62] *Id*.

Officer Richard then advises the defendant of his *Miranda* rights.[63] As explained below, this "reasonable inquir[y]," the "sole justification" of which was "the protection of the police officer and others nearby," is allowable during a *Terry* stop and does not convert same into a custodial interrogation requiring *Miranda* warnings.[64]

"In general, 'the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless' the defendant has first been given *Miranda* warnings."[65] In *Miranda*, "the Supreme Court determined that 'the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney.'"[66] "The rights established in *Miranda* . . . 'were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.'"[67] "Importantly, these rights,

---

[63] *Id.* at 02:15-02:28.

[64] *Terry*, 392 U.S. at 29-30.

[65] *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *Miranda v. Arizona*, 384 U.S. 346, 444 (1966)).

[66] *United States v. Wright*, 777 F.3d 769, 773 (5th Cir. 2015) (quoting *Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981)).

[67] *Wright*, 77 F.3d at 774 (quoting *Davis v. United States*, 512 U.S. 452, 457 (1994) (citation and quotation marks omitted)).

or measures, were 'designed to counteract the "inherently compelling pressures" of custodial interrogation.'"[68]

*Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[69] Determining whether a person is "in custody" requires an objective inquiry that depends on the "totality of circumstances."[70] A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the defendant's position would have understood the situation to constitute a restraint on his freedom of movement of the degree that the law associates with formal arrest.[71]

Importantly, "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*. For example, traffic stops—stops which constitute a Fourth Amendment seizure—do not automatically place a person in custody for purposes of *Miranda*."[72] While the two concepts share a common element of restraint on freedom, the critical difference between a "seizure" in the

---

[68] *Wright*, 777 F.3d at 774 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991); *see also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("In *Miranda*, we . . . recognized that 'the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed.")).

[69] *Miranda*, 384 U.S. at 444.

[70] *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015).

[71] *Wright*, 777 F.3d at 774; *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[72] *Bengivenga*, 845 F.2d at 598.

Fourth Amendment sense and "in custody" in the *Miranda* sense, "is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest."[73] At the time that this defendant made the statement at issue, Officer Richard was engaging in "conduct more analogous to a noncustodial investigative stop than a formal arrest."[74]

As the Fifth Circuit has made clear, "[o]fficers possessing reasonable articulable suspicion of a person's participation in criminal activity may seize the suspect in accord with the Fourth Amendment to conduct an investigative stop—a narrow intrusion involving limited detention accompanied by brief questioning and, if justified, a frisk for weapons."[75] "Such investigative stops do not render a person in custody for purposes of *Miranda*."[76] The Supreme Court has explained that the comparatively nonthreatening character of detentions and noncoercive aspect of ordinary traffic stops supports the holding that *Terry* stops are not subject to the dictates of *Miranda*.[77] Thus, an officer may ask a detainee a moderate number of questions to confirm identity and obtain information confirming or dispelling the officer's suspicions.[78]

---

[73] *Bengivenga*, 845 F.2d at 598.
[74] *See Bengivenga*, 845 F.2d at 599.
[75] *Id*. at 599.
[76] *Id*. (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984)).
[77] *Berkemer*, 468 U.S. at 439-40.
[78] *Id.* at 439.

*Terry* explicitly allows officers to make "reasonable inquiries," during the course of an investigatory stop, "where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety[.]"[79] The Fifth Circuit has repeatedly upheld investigatory detentions, pursuant to *Terry*, where no *Miranda* warnings were given.[80] Likewise, by analogy, in upholding a detention during a protective sweep of the defendant's home, in *United States v. Scroggins*, the Fifth Circuit acknowledged that, because "the purpose of detention was to maintain safety, and [the defendant] was found to have ammunition when frisked, it was reasonable for [the law enforcement agent] to ask about the location of firearms in the home."[81]

In *United States v. Lewis,* the Fifth Circuit upheld a district court's finding that a defendant's questioning "was a *Terry* stop and thus it was not necessary to administer *Miranda* warnings."[82] In *Lewis*, officers responded to a call regarding a man, who "had made a threat and possibly had a gun," at a fuel station.[83] In the

---

[79] *Terry*, 392 U.S. at 30.
[80] *See, e.g., Bengivenga*, 845 F.2d at 599-600; *Ortiz*, 781 F.3d at 224-25, 233; *United States v. Coleman*, 610 F. App'x 347, 353 (5th Cir. 2015); *United States v. Rodriguez*, 168 F. App'x 553, 554 (5th Cir. 2006); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) ("While appellants were under no obligation to answer the questions, the Constitution does not forbid law enforcement officers from asking.").
[81] *United States v. Scroggins*, 599 F.3d 433, 445 (5th Cir. 2010) (declining to justify detention under *Terry*, due to location inside of defendant's home, but nonetheless upholding seizure and questioning under principles set forth in *United States v. Gould*, 364 F.3d 578 (5th Cir. 2004) (en banc)).
[82] *United States v. Lewis*, 208 F. App'x 298, 299 (5th Cir. 2006).
[83] *Id*.

course of responding to and investigating the situation, the officers spoke to the defendant and asked whether he had any weapons on his person. The defendant responded "I always have something on," which the officers interpreted to mean that the defendant had a weapon.[84] At that point, the officers ordered the defendant to his knees, handcuffed him and asked where the weapon was, and the defendant replied that it was in his left boot.[85] The defendant was ultimately arrested for, *inter alia*, possession of a firearm by a convicted felon, and filed a motion to suppress the firearm and the statements made to the officers.

The *Lewis* defendant did not contest the validity of his initial questioning but insisted that "the police exceeded the permissible scope of such a *Terry* stop by ordering him to his knees and handcuffing him before frisking him."[86] He argued "that this conduct transformed the stop into a de facto arrest that was illegal because it was not supported by probable cause[;]" therefore, the district court erred in denying the motion to suppress. In rejecting this argument and affirming the district court, the Fifth Circuit found:

> We have observed that "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do[es] not automatically convert an investigatory detention into an arrest requiring probable cause." In this case, given that Lewis had made a statement which reasonably led Officer Reynolds to believe that he was armed, it

---

[84] *Id.*

[85] *Id.*

[86] *Id.* at 300.

was not unreasonable to take the precaution of handcuffing Lewis and frisking him. Nor was it unreasonable to handcuff Lewis before frisking him. [¶] Once the officers found the weapon in Lewis's boot, they had probable cause to make the arrest. Before that time, the actions of the police officers were within the permissible bounds of an investigatory detention under *Terry*. The district court did not err in denying the motion to suppress.[87]

The overarching consideration is whether the officers' conduct, in any given situation, was reasonable in light of the totality of circumstances. "In determining whether the officer's response to the perceived threat was reasonable, a court must give due weight to the specific reasonable inferences that the officer is entitled to draw from the facts in light of his experience and training."[88]

Here, again, the officers on the scene were presented with a dangerous situation, in which they were faced with the difficult tasks of approaching an unconscious man, behind the wheel of a running motor vehicle, *known* to be in possession of a firearm, at approximately midnight; awakening that man; and neutralizing the scene. The police were unaware of the cause of the man's unconsciousness, nor could they know his intent vis-a-vis the gun which was gripped in his hand.[89] Once the vehicle was placed in park and the defendant had exited, with

---

[87] *Id*. at 301 (citations omitted).

[88] *Sanders*, 994 F.2d at 203.

[89] The late hour, coupled with the defendant's unconsciousness, contributes to the potential danger facing Officer Richard and the other officers on scene. *See, e.g., United States v. Michelletti,* 13 F.3d 838, 842-43 (5th Cir. 1994) ("Other circumstances surrounding the encounter [between officers and defendant] signaled a need for caution[,]" including the fact that "it was closing time at a bar, a late hour when the presumably well-lubricated habitués would begin heading for home— or for trouble.").

his hands visible and empty, the officers were entitled, and indeed obligated, to neutralize any potential danger to themselves or others by locating the previously-observed firearm.[90] While Officer Richard attempted to ascertain whether the firearm was *on the defendant's person*, the defendant voluntarily admitted that two firearms remained *in the vehicle*. Thus, in accordance with *Terry*, "[a]t the time he seized petitioner and searched him for weapons, Officer [Richard] had reasonable grounds to believe that [the defendant] was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized."[91]

"Police must make in-the-moment judgments as to when to administer *Miranda* warnings."[92] In light of the "endless variations in the facts and circumstances," there is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an investigative stop."[93] Instead, on a case-by-case basis, "[t]he question is whether the police acted unreasonably in failing to recognize or pursue [alternative less-intrusive means]."[94] Here, this Court does not hesitate to find that the defendant was not subject to custodial interrogation; rather, the officers

---

[90] *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (stating that the police "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop").

[91] *Terry*, 392 U.S. at 30.

[92] *J.D.B. v. N. Carolina* 564 U.S. 261, 271 (2011).

[93] *Florida v. Royer*, 460 U.S. 491, 506 (1983).

[94] *United States v. Sharpe*, 470 U.S. 675, 687 (1985).

knew that the defendant was armed and dangerous and therefore effected a lawful investigative detention, pursuant to *Terry*, complete with a protective frisk for weapons which they knew to be present. Neither the protective frisk nor the inquiry as to whether there were any weapons on the defendant's person exceeded the bounds of a reasonable investigative detention. Accordingly, the motion is denied.

### Conclusion and Recommendation

For the foregoing reasons, it is recommended that the motion to suppress [Rec. Doc. 26], which was filed by the defendant Kenyatta Edmond (01), be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

Signed at Lafayette, Louisiana on this 6th day of August, 2018.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE